J. P. WATSON v. J. JAMES et al.—G. S SAWYER, Intervenor.

The rule, that parol evidence cannot be received to contradict a written acknowledgment of indebtedness, is subject to exceptions, and in the present case it was held that, under the circumstances, such evidence was admissible.

Where it is evident that an instrument in the form of a conditional sale was intended by the parties to be executed in the form of a common law mortgage, it will not be regarded as a sale.

One in whom the legal title to property in Louisiana is vested, subject to a trust created in favor of others by deed of trust executed in another State, has full power to mortgage the property.

APPEAL from the District Court of the Parish of Madison, *Farrar*, J. *J. H. Farrar* and *Snyder & Hynes*, for plaintiff. *Short & Parham* and *Sparrow*, for defendants. *York & Sawyer*, for intervenor, appellant.

BUCHANAN, J. Three distinct suits are consolidated in this record, to-wit: a petitory action instituted by *Watson* against *James*; an executory proceeding by *Sawyer* against *Watson*; and an injunction suit by *James* against *Watson & Sawyer*.

The first question for solution is, the right of *Watson* to contradict his acknowledgments of indebtedness to *Sawyer*, contained in a receipt, two promissory notes and two authentic acts of mortgage. The receipt is for ten thousand dollars, the notes are for twelve thousand dollars each, and the mortgages are given to secure the notes.

It is admitted in argument, that these various evidences of debt grow out of the same transaction, to-wit, a loan of money made by the appellant, *George S. Sawyer*, to *John P. Watson*, in April, 1855. This money passed through the hands of one *Britton*, a banker in Natchez, by whom it was counted and delivered to *Watson*, and by whom the receipt for the amount so counted, ten thousand dollars, was written. This receipt was signed by *Watson* in *Britton's* presence, as testified by the latter. It reads as follows:

" Received from *George S. Sawyer*, ten thousand dollars in cash.

JOHN P. WATSON."

*Britton*, examined as a witness for the appellant, *Sawyer*, under a commission, states that the amount expressed in the receipt, consisted of a certificate of deposit in the Citizens' Bank of Louisiana, to the credit of *George S. Sawyer*, and endorsed by him, for six thousand dollars, and four thousand dollars in cash or certificates of deposit; and that *Watson*, at the time he received the same, deposited in the banking house of *Britton*, to the credit of *S. McNeil*, the sum of six thousand dollars, being the amount stated in the Citizens' Bank certificate of deposit.

We think it was competent for *Watson* to prove by parol, as he has done, that the true amount of *Sawyer's* advance of funds to *Watson* was the six thousand dollars thus deposited to the credit of *McNeil* in *Britton's* bank; together with a farther sum of one hundred and thirty-eight dollars paid by *McNeil* for *Watson*, and eight hundred dollars paid *Carroll & Pritchard* by *Sawyer*, to the credit of *Watson*. The aggregate amount of these advances is six thousand nine hundred and thirty-eight dollars. Add twelve hundred dollars, which *Watson* admits, of record, to be due by him to *Sawyer* for professional services rendered, and the true consideration of the note of *Watson*, favor *Sawyer* or order, payable at thirty days, for twelve thousand dollars, dated April 23, 1855, and secured by mort-

gage before *Miller*, notary, is thus established to have been *eight thousand one hundred and thirty-eight dollars*. The note of like amount, dated June 4th, 1855, payable ten days after date, and secured by mortgage on slaves, by act before *Beatty*, notary, in Pointe Coupée parish, was a renewal of the other note. Both these notes bore interest on their face, at eight per cent. per annum, from date.

On the same day with the execution of the last of these notes, and of the mortgage to secure the same, to-wit, June 4th, 1855, and before the same notary, *Watson* executed what the counsel in argument call a *conditional sale* to George S. *Sawyer*, of the same negroes thus mortgaged, (but which both the acts declare to be illegally in the possession of *James* and wife, in the parish of Madison). The condition of this conveyance is, that if *Watson*, or any one for him, shall pay to *Sawyer* the sum of twelve thousand dollars, and interest, amount of *Watson's* note to *Sawyer* of the 23d April, 1855, this sale shall be null and void, or else remain in full force.

The second question which this record presents, is, the effect of this *conditional sale*. The form of the instrument is that of a common law mortgage, and the evidence leaves no doubt upon our minds, that it was intended as such, when made, at least by *Watson*, and probably by *Sawyer*. It must be observed, that *Sawyer* was a Mississippi lawyer, and *Watson* a Mississippi planter, until within a few years past, as appears from the record.

But it seems strange, that they should have entered into a contract of this kind, having reference to a debt, (the note of the 23d April, 1855,) which had been extinguished by novation, as shown-by the declarations of this very instrument, which make mention of the note of the 4th June, 1855, and of the mortgage to secure that note, as having been executed previously, although on the same day.

Under these circumstances, we regard this pretended conditional sale of forty slaves by *Watson* to *Sawyer*, of the 4th June, 1855, and also the re-transfer or conveyance of twenty of the same slaves by *Sawyer* to *Watson*, of the 12th July, 1855, as mere nullities.

It remains to be determined, whether the mortgage of *Sawyer*, passed before *Beatty*, notary, the 4th June, 1855, be operative upon the negroes in the possession of the defendants.

We have seen that *John P. Watson* was indebted to *George S. Sawyer* for money lent and professional services; and that, to secure the payment of the said debt, he mortgaged, on the 4th of June, 1855, forty slaves, described as belonging to *Watson*, but illegally detained by *James* and wife. This mortgage was duly recorded in the parish of Pointe Coupée, the domicil of *Watson*. The next day after its date, to-wit, on the 5th of June, 1855, *Watson* instituted this petitory action in the parish of Madison, against *James* and wife, and sequestered the slaves so detained by them.

In his petition, *Watson* asserts title to the slaves in himself, in virtue of a judicial sale made to him at public auction, by a Commissioner in Chancery, at the door of the Court House of the County of Jefferson, State of Mississippi, on the 9th of February, 1848, in execution of a decree of the Court of Chancery for the Southern District of the State of Mississippi.

The defendants, *James* and wife, answered, pleading that the title of the slaves sequestered was in themselves; that those slaves had been conveyed to the plaintiff, *Watson*, *in trust*, for the defendant, *Mrs. James*, in the State of Mississippi, under an agreement made and entered into between the parties; which agreement was annexed, as part of the answer.

This instrument is entitled : " Memorandum of an agreement made and entered into the 15th February, 1848, by and between *John P. Watson*, of the parish of Pointe Coupée, in the State of Louisiana, of the first part, and *Joshua James* and *Mary H. James*, of the county of Jefferson, in the State of Mississippi, of the second part."

It stipulates that, whereas *Watson* did purchase the slaves sequestered and other property, at a judicial sale in execution of a judgment against *James* and wife, in the Court of Chancery in Mississippi, and did receive a conveyance for the same from the Commissioner of said Court, and did satisfy the judgment against *James* and wife by a certain draft and five certain promissory notes of said *Watson ;* and whereas *James* and wife were indebted to *Quitman & McMurran* in the sum of $250 ; now the said *Watson* agrees to hold all the property thus conveyed to him, and its fruits, *upon the trusts, for the interests and purposes, and under and subject to the powers, provisions, limitations, declarations and agreements, hereinafter declared, that is to say :*

First. The rents and fruits of said property to be applied to the payment of the costs and charges of administration; to the payment of the draft and notes given by *Watson* to the judgment creditor of *James* and wife, as aforesaid, and of all interest, costs and charges thereon ; and to the payment of the debt to *Quitman & McMurran.*

Second. The said *Watson* shall have the lawful title of the property, and may, at any time sell the whole or any portion of the same, on such terms as he may deem expedient, and apply the proceeds to the payment of any of the above specified debts and charges ; provided the surplus of said proceeds be re-invested in other real or personal estate, to be settled upon *Mrs. James* and her children, as hereinafter provided.

Third. The said *Watson* to have " full and absolute power of control, management and disposal, by sale, exchange, and removal out of this (Mississippi) into any other State, of all or any part of said real and personal property, at any and all times, before full payment of all the debts and charges aforesaid.

Fourth and lastly : " Upon trust that after the payment and satisfaction of all of said costs, charges, expenses, draft, notes, debt and interest, the said *Watson*, his heirs and assigns, shall, by good and sufficient assurances, settle and convey all the above described real and personal property, with the avails and increase thereof, which may then be held by him and undisposed of, as herein before provided, " upon and to the said *Mary H. James*, for and during her natural life, so that she may take, enjoy, and dispose of the clear income and product thereof to her own separate use and benefit, until her death ; and after her death, upon and to her children then living, and the descendants of such as may then be dead, to take as purchasers, and according to the statute of descent and distribution of the State of Mississippi, to be had and held by said children and descendants, their heirs and assigns, forever."

This instrument cannot have the effect of avoiding a Louisiana contract made by *Watson*, as owner of slaves which were, at the time of making such contract, had been for many years previously, and still remain within the territorial limits of this State.

The title of the judgment debtors, *James* and wife, in the slaves sequestered in this suit, was acquired by *Watson*, at the judicial sale of the 9th February, 1848, for a *bona fide* price paid by him.

The agreement of *Watson* with those judgment debtors, made on the 15th

February, 1848, six days after the said judicial sale, did not divest the title out of *Watson;* still less, did it reconvey the title to *James* and wife. On the contrary, all the attributes of ownership, the powers of administering, of removing, of alienating, are reserved to *Watson.* There is not, in this agreement, even a contemplation of a prospective or contingent conveyance of the property by *Watson* to *James* and wife; but merely of an eventual settlement, and by another trust deed, of the fruits of the property, upon *Mrs. James* during her life : the ultimate beneficiaries being the children of *Mrs. James* who shall survive her, and the descendants, surviving her, of those of her children who shall have died before her.

The power of alienation in *Watson,* necessarily included the power of mortgaging the negroes in question.

It is, therefore, adjudged and decreed, that the judgment of the District Court, so far as it regards *George S. Sawyer,* the appellant, be reversed ; and it is further decreed, that the appellant, *George S. Sawyer,* recover of the appellee, *John P. Watson,* eight thousand one hundred and thirty-eight dollars, with interest at the rate of eight per cent. per annum, from the 4th June, 1855, until paid, and costs in both courts ; and that the slaves specified in the act of mortgage passed before *William Beatty,* Notary Public in the parish of Pointe Coupée, on the 4th June, 1855, being the same slaves sequestered in the suit of *John P. Watson* v. *Joshua James* and wife, and also seized under executory process in the suit of *George S. Sawyer* v. *John P. Watson,* in the District Court of Madison Parish, be seized and sold to satisfy this judgment.

LAND, J., absent.